## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| **ESTATE OF RENARDO GREEN**, *et al.*, | | |
| | * | |
| *Plaintiffs*, | | |
| | * | |
| | | **Case No. 1:22-cv-03198-JRR** |
| **v.** | * | |
| | | |
| **CITY OF ANNAPOLIS**, *et al.*, | * | |
| | | |
| *Defendants*. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## <u>MEMORANDUM OPINION</u>

Plaintiffs Estate of Renardo Green (c/o co-personal representatives Brittany R. Green, Tiffany R. Green, Jayda A. Green, Phyllis McGowan, and Tracy L. Naylor) (the "Estate"), and Brittany R. Green, Tiffany R. Green, Jayda A. Green, Phyllis McGowan, and Tracy L. Naylor, individually (collectively, the "Individual Plaintiffs;" together with the Estate, "Plaintiffs"), bring this action against the City of Annapolis (the "City"), Sergeant Mark Cochran, Officer Matthew Bodmer, Officer Anna Woytko, Officer Ivan Siminyuk (the "Officer Defendants," individually and in their official capacities), and John Does 1-5 (the "Doe Defendants") (collectively,  the "Defendants").

This matter comes before the court on Defendants' Motion to Dismiss Plaintiffs' Complaint and/or for More Definite Statement (ECF No. 6; the "Motion") and Plaintiffs' Motion for Leave to Conduct Early Discovery.  (ECF No. 23; the "Discovery Motion").  The court has reviewed all papers.  No hearing is necessary.  Local Rule 105.6 (D. Md. 2023).

I.    **BACKGROUND**[1]

This action arises out of the death of Renardo Green ("Green"), a 51-year-old African American man, while in protective custody.  Plaintiffs Brittany R. Green, Tiffany R. Green, Jayda A. Green, and Phyllis McGowan are Green's children.  (ECF No. 1 ¶ 21; the "Complaint.")  Plaintiff Tracy L. Naylor was Green's spouse until his death.  *Id.* ¶ 22.  Plaintiff Estate of Green is established in Anne Arundel County under the laws of the State of Maryland with the Individual Plaintiffs serving as co-personal representatives of the Estate.  *Id.* ¶ 24.

Defendant City is a municipality and maintains control over the City of Annapolis Police Department ("APD").  (ECF No. 1 ¶ 26.)  The APD is responsible for establishing customs, policies, and standing orders controlling the actions of its police officers, as well as their training and supervision regarding the appropriate use of force against, and restraint of, individuals taken into custody.  *Id.* ¶ 27.  At all times relevant to the Complaint, the City employed the Officer Defendants as law enforcement officers in the APD; and the Officer Defendants acted within the course and scope of their employment, and under color of state law.  *Id.* ¶ 28.

The City also maintains and controls the Annapolis Fire Department ("AFD"), which includes Emergency Medical Services ("EMS") for the purposes of providing health care and rescue services.  *Id.* ¶ 29.  The City employs paramedics, emergency responders, and other health care workers within AFD's EMS Division, including the Doe Defendants, to provide health care services to Annapolis residents.  *Id.* ¶ 31.  AFD is responsible for establishing customs and policies controlling the actions of its personnel, including the Doe Defendants.  *Id.* ¶ 32.  At all relevant

---

[1] For purposes of this memorandum, the court accepts as true the well-pled facts set forth in the Complaint.  (ECF No. 1.)

times, the Doe Defendants were employed by the City, and acted within the course and scope of their employment.  *Id.* ¶ 33.

Plaintiffs allege that "the AFD did not train its personnel to avoid face-down restraint or promulgate a policy prohibiting face-down restraint until November 1, 2022," despite the MIEMSS[2] protocol that EMS responders not place patients "in a face-down, hobbled, or hog-tied position."  *Id.* ¶¶ 4, 11.

On June 1, 2021, at approximately 2:15 a.m., the Officer Defendants responded to Plaintiff Naylor's 911 call requesting assistance for Green, who was suffering from a disturbed mental state and injuries from self-inflicted lacerations.  (ECF No. 1 ¶¶ 38-39.)  Upon arrival, the Officer Defendants observed Green's erratic behavior and placed him into protective custody for an emergency evaluation.[3]  *Id.* ¶ 45.  During the encounter with Green, the Officer Defendants were outfitted with body-worn cameras, which were operable and recording the events as they unfolded. *Id.* ¶ 42.  The Officer Defendants subdued Green by holding his ankles and using two sets of handcuffs to place his hands behind his back.  *Id.* ¶ 46.  Thereafter, the Officer Defendants positioned Green onto his side on the kitchen floor until the Doe Defendants arrived to provide medical services.  Officer Defendants maintained Green on his side to ensure that his airway was kept open.  *Id.* ¶¶ 47-48.

"At an unknown time thereafter," following arrival on the scene by the Doe Defendants, the Officer Defendants and/or the Doe Defendants positioned Green face down (prone) with his hands cuffed behind his back in order to transport him to the ambulance waiting outside; once in the ambulance, Green was turned onto his backside before being transported to the hospital in

[2] MIEMSS means Maryland Medical Protocols for Emergency Medical Services as promulgated by the Maryland Institute for  Emergency Medical Services Systems.  (ECF No. 1 ¶ 4.)
[3] *See* MD. CODE ANN., HEALTH – GEN §§ 10-622, *et seq.*

Annapolis.  *Id.* ¶¶ 48, 49, 56-59, 61, 64-67.  Specifically, the Complaint alleges: The Officer Defendants maneuvered Green onto a white sheet, and, using the sheet to lift him, moved Green to a portable stretcher in the living room; Green was placed on a portable stretcher face down with his hands still cuffed behind his back.  (ECF No. 1 ¶¶ 56-57.)  At 2:37 a.m., the Doe Defendants transported Green out of the residence and loaded him onto a rolling stretcher that was just outside the building.  *Id.* ¶¶ 59, 61.  At 2:38 a.m., Officer Woytko advised she was putting Green "'under an emergency petition.'"[4]  *Id.* ¶ 59.  At approximately 2:40 a.m., Green "'was still yelling and was lifting his chest off the stretcher while'" the Doe Defendants wheeled Green to the back of the ambulance.  *Id.* ¶ 62.

At 2:41 a.m., Green was loaded into the ambulance.  At this time, Green was no longer yelling.  "'One of the paramedics'" asked Green to turn his head to the side  (ECF No. 1 ¶ 63.)  Green did not respond, so the paramedic turned Green's head.  *Id.*  At 2:42 a.m., "'one of the paramedics advised [Officer Bodmer that Green]'s nose was clear and his airway was open.'"  *Id.* ¶ 64.  At 2:44 a.m., the Doe Defendants asked Officer Bodmer for another set of handcuffs, which Sergeant Cochran provided.  *Id.* ¶ 66.  At 2:45 a.m., the Doe Defendants repositioned Green onto his back and handcuffed him to the stretcher.  *Id.* ¶ 67.  Three minutes later, at 2:48 a.m., the Doe Defendants began administering CPR to Green and transported him to Anne Arundel Medical Center ("AAMC"), where AAMC medical staff continued rendering aid.  *Id.* ¶ 68.  Officer Woytko met Officer Bodmer at AAMC and "completed an emergency evaluation" for Green.  *Id.* ¶ 70.  AAMC took custody of Green and "Mobile Crisis" was notified of the emergency evaluation.  (ECF No. 1 ¶ 70.)

---

[4] *See* n.3.

Plaintiff Naylor learned at approximately 8:00 a.m. on June 1, 2021, that Green had "likely suffered brain death due" due to cardiopulmonary failure; on June 4, 2021, his family chose to discontinue his life support and Green died.  *Id.* ¶ 74.  On September 20, 2021, the Maryland Office of the Chief Medical Examiner "reportedly ruled" Green's death a homicide "caused by 'prone restraint cardiac arrest.'"  *Id.* ¶ 79.

On December 13, 2022, Plaintiffs filed the Complaint.  The Complaint sets forth twenty counts: 42 U.S.C. § 1983 Pursuant to the Fourth and Fourteenth Amendments for Excessive Force & Violation of Right to Due Process & Bodily Integrity as a Survival Action against Doe and Officer Defendants (Count I); 42 U.S.C. § 1983 Pursuant to the Fourth and Fourteenth Amendments for Excessive Force & Violation of Right to Due Process & Bodily Integrity as a Wrongful Death Action against Doe and Officer Defendants (Count II); 42 U.S.C. § 1983 Pursuant to an Unconstitutional Policy or Custom/Failure to Train & Supervise as a Survival Action against Defendant City (Count III); 42 U.S.C. § 1983 Pursuant to an Unconstitutional Policy or Custom/Failure to Train & Supervise as a Wrongful Death Action against Defendant City (Count IV); Conspiracy to Deprive Constitutional Rights and/or Failure to Intervene Pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1985 as a Survival Action against Doe and Officer Defendants (Count V); Conspiracy to Deprive Constitutional Rights and/or Failure to Intervene Pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1985 as a Wrongful Death Action against Doe and Officer Defendants (Count VI); Violation of Right to Due Process & Deliberate Indifference to Serious Medical Needs Pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983 as a Survival Action against All Defendants (Count VII); Violation of Right to Due Process & Deliberate Indifference to Serious Medical Needs Pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983 as a Wrongful Death Action against All Defendants (Count VIII); Deprivation of Liberty, Excessive Force & Homicide

in Violation of Maryland Declaration of Rights Article 24 as a Survival Action against All Defendants (Count IX); Deprivation of Liberty, Excessive Force & Homicide in Violation of Maryland Declaration of Rights Article 24 as a Wrongful Death Action against All Defendants (Count X); Assault and Battery as a Survival Action against Doe and Officer Defendants (Count XI); Assault and Battery as a Wrongful Death Action against All Defendants (Count XII); Negligence as a Survival Action against All Defendants (Count XIII); Negligence as a Wrongful Death Action against All Defendants (Count XIV); Gross Negligence as a Survival Action against All Defendants (Count XV); Gross Negligence as a Wrongful Death Action against All Defendants (Count XVI); Negligent Hiring, Training, Retention, and Supervision as a Survival Action against Defendant City (Count XVII); Negligent Hiring, Training, Retention, and Supervision as a Wrongful Death Action against Defendant City (Count XVIII); Wrongful Death against All Defendants (Count XIX); and Survival Action against All Defendants (Count XX).  (ECF No. 1 at 18-52.)

Defendants now move to dismiss the Complaint in its entirety and/or for a more definite statement.  (ECF No. 6-1 at 1.)

## II.   <u>LEGAL STANDARDS</u>

### Federal Rule of Civil Procedure 12(b)(6)

"'The purpose of Rule 12(b)(6) is to test the sufficiency of a complaint' and not to 'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'"  *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)).  Accordingly, a "Rule 12(b)(6) motion should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the

plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards*, 178 F.3d at 244 (*citing Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)).

"While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). "A complaint that provides no more than 'labels and conclusions,' or 'formulaic recitation of the elements of a cause of action,' is insufficient." *Bourgeois v. Live Nation Ent., Inc.*, 3 F. Supp. 3d 423, 434 (D. Md. 2014) (quoting *Twombly*, 550 U.S. at 555). "The [c]ourt must be able to deduce 'more than the mere possibility of misconduct'; the facts of the complaint, accepted as true, must demonstrate that the plaintiff is entitled to relief." *Evans v. 7520 Surratts Rd. Operations, LLC*, No. PX-21-1637, 2021 U.S. Dist. LEXIS 221041, at *4 (D. Md. Nov. 16, 2021) (quoting *Ruffin v. Lockheed Martin Corp.*, 126 F. Supp. 3d 521, 526 (D. Md. 2015)).

**Federal Rule of Civil Procedure 12(e)**

Rule 12(e) provides, in relevant part:

> A party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response. The motion must be made before filing a responsive pleading and must point out the defects complained of and the details desired.

FED. R. CIV. P. 12(e). "Unlike a motion to dismiss for failure to state a claim, which attacks the legal sufficiency of a complaint, a motion for a more definite statement focuses on whether a party has 'enough information to frame an adequate answer.'" *Malibu Media, LLC v. Doe*, No. WDQ-14-cv-748, 2015 WL 857408, at *2 (D. Md. Feb. 26, 2015) (quoting *Streeter v. SSOE Sys.*, No.

WMN-09-cv-01022, 2009 WL 3211019, at *10 (D. Md. Sept. 29, 2009) (citation and internal quotation marks omitted)).  "A motion for a more definite statement challenges the unintelligibility or ambiguity of the complaint, not the adequacy of the allegations to state a claim."  *Id.*

"Whether to grant a motion for a more definite statement is 'generally left to the district court's discretion.'"  *Malibu Media*, 2015 WL 857408, at *3 (quoting *Hodgson v. Va. Baptist Hosp., Inc.*, 482 F.2d 821, 824 (4th Cir. 1973)).  "However, this motion is disfavored because of the liberal pleading standard."  *Id.*  "If the movant seeks information that is available or properly sought through discovery, the motion should be denied."  *Id.*

## III.   CONSIDERATION OF EXHIBITS

Defendants attach three exhibits to their Motion: Exhibit 1 – Field Case Report (ECF No. 6-2); Exhibit 2 – Supplemental Narrative reviewed June 9, 2021 (ECF No. 6-3); and Exhibit 3 – Supplemental Narrative reviewed June 5, 2021.  (ECF No. 6-4.)  Plaintiffs quoted and referenced significant portions of the Field Case Report and Supplemental Narratives in the Complaint.  (ECF No. 1 ¶¶ 41, 43-48, 54, 56-71.)  Additionally, Plaintiffs make reference to the body-worn camera footage that captured the incident involving Green (ECF No. 1 ¶ 42) and several links to various electronic documents and articles including:

> U.S. Department of Justice, Positional Asphyxia—Sudden Death (June 1995), available at https://www.ojp.gov/pdffiles/posasph.pdf.

*Id.* ¶ 3 n.1.

> The Maryland Medical Protocols for Emergency Medical Services (2020) at 322, available at https://www.miemss.org/home/Portals/0/Docs/Guidelines_Protocols/MD-Medical-Protocols-2020-20200610.pdf?ver=2020-06-12-120333-457.

*Id.* ¶ 4 n.2.

> Use of Force Policy (March 2021), available at

https://web.archive.org/web/20211210044717/https://www.annapolis.gov/DocumentCenter/View/19269/C3--Use-of-Force-March-2021-PDF.   This outdated version of the policy is still available on the City's website. https://www.annapolis.gov/DocumentCenter/View/19269/C3--Use-of-Force-March-2021-PDF.

*Id.* ¶ 7 n.4.

https://www.annapolis.gov/DocumentCenter/View/22007/C-03-Use-Of-Force-June-2022-PDF.

*Id.* ¶ 8 n.5.

https://www.marylandattorneygeneral.gov/Pages/IID/Reports/111822_IID_Report.pdf (page 85 of 95 of pdf file); https://public.powerdms.com/BALTIMOREMD/documents/51042.

*Id.* ¶ 9 n.6.

Policy 7.23, Patient Care, available at https://www.annapolis.gov/DocumentCenter/View/16634/723-PatientCare-Response-and-Transportation-PDF.

(ECF No. 1 ¶ 11 n.7.)

Emergency Medical Services, Annapolis.gov, https://www.annapolis.gov/355/Emergency-Medical-Services

*Id.* ¶ 30 n.8.

Lilly Price, Annapolis man Renardo "Hot Dog" Green dies after suffering cardiac arrest on Memorial Day, Capital Gazette (June 14, 2021), https://www.capitalgazette.com/news/ac-cn-annapolis-man-dies-green-20210614-szguzhk6vnayjoszqwsoz3hfby-story.html.

*Id.* ¶ 78 n.10.

Lilly Price, Annapolis authorities learned more than a month ago of homicide ruling for a man who died after being in police, fire custody, Baltimore Sun (Dec. 20, 2021), https://www.baltimoresun.com/maryland/annearundel/ac-cn-annapolis-custody-homicide-renardo-green-20211220-n65uuikkarhsde7l7lik2ral7i-story.html.

*Id.* ¶ 79 n.11.

See Alex Mann and Lilly Price, Death of Annapolis man who suffered cardiac arrest in custody of city fire, policy is ruled homicide by medical examiner, Capital Gazette (Dec. 17, 2021),

https://www.capitalgazette.com/maryland/annapolis/ac-cn-annapolis-in-custody-death-20211217-u4mvbta7tndoppflpd3seyoxmm-story.html.

*Id.* ¶ 81 n.13.

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus.* 637 F.3d 435, 448 (4th Cir. 2011)).  Usually, the court does not "consider any documents that are outside of the complaint, or not expressly incorporated therein[.]" *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed v. Town of Gilbert*, 576 U.S. 155 (2015).

"But, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment." *Loper v. Howard Cty. Pub. Sch. Sys.,* 2021 U.S. Dist. LEXIS 163118 at *13 (D. Md. Aug. 27, 2021) (citing *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015)).  A court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (citation omitted).

"When the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines,* 822 F.3d at 167.  "In addition to integral and authentic exhibits, on a 12(b)(6) motion the court 'may properly take judicial notice of matters of public record.'" *Id.* (quoting *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)).  Specifically, the court may take judicial notice of publicly

available information on state and federal government websites without converting the motion to one for summary judgment.  *See U.S. v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) (explaining: "This court and numerous others routinely take judicial notice of information contained on the state and federal government websites.").

In analyzing whether to consider the Field Case Report and two Supplemental Narratives, the body-worn cameral footage, and the electronic documents and articles referenced in the Complaint, the court finds *Goines* instructive.  In *Goines*, the district court relied on an incident report attached to the defendants' motion and in doing so, dismissed the claims against the officers. 822 F.3d at 165.  The Fourth Circuit concluded that "the district erred by treating as true the factual statements contained in the Incident Report."  *Id.* at 168.  The *Goines* court explained:

> As previously noted, the district court's approach to this question began with its recognition of the exhibit-prevails rule, which provides that in the event of conflict between the bare allegations of the complaint and any exhibit attached . . . , the exhibit prevails. Under the rule, if a plaintiff attaches documents and relies upon the documents to form the basis for a claim or part of a claim, dismissal is appropriate if the document negates the claim.

822 F.3d at 166 (internal citations and quotation marks omitted).

The *Goines* court further explained:

> When the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper. But in cases where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true. For example, if a prisoner attaches an unfavorable decision from a prison tribunal to show that he has exhausted his administrative remedies, he does not thereby adopt the factual findings of that unfavorable decision. Similarly, if a plaintiff attaches or references a report prepared by a third-party to show how he learned of certain facts alleged in his complaint, he does not automatically adopt all of the factual conclusions contained in the report.

> The purpose for which the document is offered is particularly important where the document is one prepared by or for the defendant. Such unilateral documents may reflect the defendant's version of contested events or contain self-serving, exculpatory statements that are unlikely to have been adopted by the plaintiff. Treating the contents of such a document as true simply because it was attached to or relied upon in the complaint, even though the plaintiff relied on it for purposes other than truthfulness, would be contrary to the concept of notice pleading and would enable parties to hide behind untested, self-serving assertions.

822 F.3d at 167-68 (internal citations and quotation marks omitted).

The *Goines* determined that the plaintiff's purpose for relying on the incident report in his complaint "was not to assert the truthfulness of the statements contained in the [r]eport, but instead to illustrate the mistakes he believed were made by the [o]fficers." *Id.* at 168. Indeed, the plaintiff did "not base his claims on the [i]ncident [r]eport—that is, no portion of any of his claims [was] dependent upon the truth of any statements contained in the [i]ncident [r]eport." *Id.*

In the instant case, Plaintiffs quote and reference several parts of the Field Case Report and Supplemental Narratives in the Complaint. (ECF No. 1 ¶¶ 41, 43-48, 54, 56-71.) Plaintiffs allege that the report and the narratives provide details of the incident that led to Green's death. Unlike the plaintiff in *Goines*, here, Plaintiffs rely on the Officer Defendants' reports for the truth of the information contained therein because that information serves as the factual basis for Plaintiffs' claims. For example, Plaintiffs allege:

> Officer Woytko reported the following when she finished speaking to Plaintiff Naylor:
>
> I turned around and observed AFD medics were moving the male subject onto a stretcher, using a sheet, to be taken out of the residence. The male subject was laying on his stomach on the floor of the kitchen still handcuffed behind the back. The male subject was then taken out of the residence by AFD. He was strapped down on a stretcher on his stomach, and handcuffed behind the back.

(Emphasis added.)

Officer Bodmer also documented Mr. Green being strapped face-down on the stretcher:

At approximately 0234 hours, at the direction of AFD, I assisted them with putting a white sheet under Mr. Green' stomach so that we could lift him and put him onto a portable stretcher. . . . At 0236 hours I along with members of AFD picked Mr. Green up using the white sheet and carried him over to where there was a stretcher in the living room. Mr. Green was lying on his stomach on the stretcher and still yelling "yeah bitch." AFD then took control of Mr. Green, strapping him into the portable stretcher so he did not fall off of it.

(Emphasis added.)

Thus, per Officer Bodmer's and Officer Woytko's accounts, Mr. Green was restrained in a face-down position by 2:34 AM at the latest, before being strapped face-down to the stretcher.

(ECF No. 1 ¶¶ 56-58.)

Plaintiffs' allegations demonstrate their reliance on the reports for the truth: In paragraphs 56 and 57, Plaintiffs directly quote the Defendant Officers' reports to corroborate, illustrate or verify the allegations; in paragraph 58, Plaintiffs conclude: "Thus, per Officer Bodmer's and Officer Woytko's accounts . . . ," Green was restrained in a face-down position by 2:34 a.m. at the latest. Myriad instances of such reliance are woven throughout the Complaint. Accordingly, the court will consider the Field Case Report and two Supplemental Narratives in resolving the Motion; and will credit the reports over conflicting allegations in the Complaint, if any. *Goines*, 822 F.3d at 167.

With respect to the body-worn camera footage, Plaintiffs reference the footage in the Complaint (ECF No. 1 ¶ 42 n.9) and note in their Opposition: "As stated in Plaintiffs' Complaint (ECF No. 1 at 10) and reflected in the Officer Defendants' reports appended to Defendants' Motion . . . , all the facts and circumstances relevant to Plaintiffs' claims were recorded by the body

cameras worn by the Individual Officer Defendants." (ECF No. 14 at 7.) Plaintiffs' reference in the Complaint to the body-worn camera footage, coupled with their averments in the Opposition regarding same, provide ample support for the court to consider the body-worn camera footage in resolving the Motion.[5] *See Mateusz Fijalkowski v. Wheeler,* 361 F. Supp. 3d 577, 582 n.3 (considering a video recording of the incident at issue in resolving motion to dismiss); *Thompson v. Badgujar*, 2021 U.S. Dist. LEXIS 147923, at *3 (D. Md. Aug. 6, 2021) (considering body-worn camera footage in police shooting case and holding, "when, as here, a document or video is referenced as integral to the complaint, disputes between the allegations of the complaint and what is plain from the video are resolved in favor of the video.") Because Plaintiffs assert that the body-worn camera footage reflects the true version of the incident involving Green, the court will credit the body-worn camera footage to the extent it conflicts with the Complaint, if at all. *Goines,* 822 F.3d at 167. Finally, as set forth above, the court is entitled to, and will, consider the electronic documents and articles referenced in the Complaint in resolving the Motion.

## IV.  <u>ANALYSIS</u>

### A.  **Defendants Sued in Official Capacities**

Preliminarily, Defendants argue that the Complaint should be dismissed as against all individual Defendants to the extent they are sued in their respective official capacities, because the law is well-settled that "official capacity claims 'generally represent only another way of pleading an action against an entity of which an officer is an agent;'" and, therefore, such actions should be dismissed as improperly duplicative. (ECF No. 6-1 at 6 (quoting *Monell v. Dept. of Soc. Services,* 436 U.S. 658, 690 n.55 (1978); and citing *Vincent v. Prince George's Co.,* 157 F. Supp. 2d 588,

---

[5] The body-worn camera footage can be accessed at: <u>https://youtu.be/HlauNEpyg4Q?si=vWBrnDRalPLRtowm</u>, <u>https://youtu.be/JSTvWMig5cg?si=ngMJ3puk0H1s24D0</u>, and <u>https://youtu.be/xwEWcoGPngE?si=AvHVvESjsjqUsRkK</u>.

595 (D. Md. 2001).)  Plaintiffs fail to address this in their papers and therefore concede the point.

Further, the court agrees.  The court notes that, at this time, the Officer Defendants are named

individually and in their respective official capacities, and that the Doe Defendants are not so

named.  Therefore, to the extent the Complaint states claims against the Officer Defendants in their

respective official capacities, such claims will be dismissed in that aspect.

### B.    Motion for Leave to Conduct Early Discovery

Neither the Complaint nor the court's 12(b)(6) analysis and related rulings would be

materially enhanced or aided by early discovery.  As such, no good cause exists to permit early

discovery.  The Motion for Leave to Conduct Early Discovery (ECF No. 23) will be denied.

### C.    Counts I, II, IX and X – Excessive Force and Violation of Due Process Rights

The Complaint sets forth several claims pursuant to 42 U.S.C. § 1983, including Counts I,

II, III, IV, V, VI, VII, and VIII.

42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of
> Columbia, subjects, or causes to be subjected, any citizen of the
> United States or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action
> at law, suit in equity, or other proper proceeding for redress. . . ."

42 U.S.C. § 1983.  Section 1983 does not, standing alone, provide substantive rights; rather, it is

"a method for vindicating federal rights elsewhere conferred."  *Baker v. McCollan*, 443 U.S. 137,

144 n.3 (1979).  To state a claim under section 1983, Plaintiffs "must allege the violation of a right

secured by the Constitution and laws of the United States, and must show that the alleged

deprivation was committed by a person acting under color of state law."  *West v. Atkins*, 487 U.S.

42, 48 (1988) (citations omitted).

Counts I and II set forth section 1983 claims for violations of the Fourth and Fourteenth Amendments to the United States Constitution against the Doe and Officer Defendants.  Counts IX and X set forth companion (but independent) claims pursuant to Article 24 of the Maryland Declaration of Rights for excessive force and homicide.  (ECF No. 1.)

Defendants proffer several arguments in support of their contention that Plaintiffs' federal constitution claims set forth in Counts I and II should be dismissed, including: (1) that Plaintiffs fail to state a plausible claim against the Officer Defendants for excessive force and/or substantive due process violations; (2) the Officer Defendants are not subject to MIEMSS protocols, and the Doe Defendants' alleged failure to adhere to MIEMSS protocols does not give rise to relief under section 1983; and (3) Plaintiffs fail to adequately plead a constitutional interest in bodily integrity recognized under the Fourteenth Amendment.  (ECF No. 6-1 at 9-10.)

***Excessive Force – Fourth Amendment***

As relayed above, it is well settled that section 1983 "is not itself a source of substantive rights," but merely provides "a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144, n.3 (1979).  "In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force."  *Graham v. Connor*, 490 U.S. 386, 393-94 (1989); *see also Baker,* 443 U.S. at 140 (providing that "[t]he first inquiry in any § 1983 suit" is "to isolate the precise constitutional violation with which [the defendant] is charged").  "In most instances, that will be either the Fourth Amendment's prohibition against unreasonable seizures of the person, or the Eighth Amendment's ban on cruel and unusual punishments, which are the two primary sources of constitutional protection against physically abusive governmental conduct." *Graham*, 490 U.S. at 394.

When an excessive force claim arises out of the seizure of a free person, as was the case

with Green, the Fourth Amendment provides the necessary protections. *Graham*, 490 U.S. at 395

(explaining that "[w]here, as here, the excessive force claim arises in the context of an arrest or

investigatory stop of a free citizen, it is most properly characterized as one invoking the protections

of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . .

against unreasonable . . . seizures' of the person.")

The *Graham* Court discussed the effect of its earlier holding in *Tennessee v. Garner*, 471

U.S. 1 (1985):

> In *Garner*, we addressed a claim that the use of deadly force to
> apprehend a fleeing suspect who did not appear to be armed or
> otherwise dangerous violated the suspect's constitutional rights,
> notwithstanding the existence of probable cause to arrest. Though
> the complaint alleged violations of both the Fourth Amendment and
> the Due Process Clause, [] we analyzed the constitutionality of the
> challenged application of force solely by reference to the Fourth
> Amendment's prohibition against unreasonable seizures of the
> person, holding that the "reasonableness" of a particular seizure
> depends not only on when it is made, but also on how it is carried
> out. [] Today we make explicit what was implicit in *Garner*'s
> analysis, and hold that all claims that law enforcement officers have
> used excessive force – deadly or not – in the course of an arrest,
> investigatory stop, or other "seizure" of a free citizen should be
> analyzed under the Fourth Amendment and its "reasonableness"
> standard, rather than under a "substantive due process" approach.
> Because the Fourth Amendment provides an explicit textual source
> of constitutional protection against this sort of physically intrusive
> governmental conduct, that Amendment, not the more generalized
> notion of "substantive due process," must be the guide for analyzing
> these claims.

490 U.S. at 394-95.

### Fourth Amendment Seizure

Defendants assert that the Complaint alleges that a constitutional violation occurred "when

Mr. Green was 'restrained . . . in a face-down position to a stretcher.'" (ECF No. 6-1 at 9) (quoting

ECF No. 1 ¶ 91.)  Defendants argue that the alleged constitutional violation occurred after the Doe Defendants took control of Green; while he received medical care; and was no longer in police custody.  *Id.*  Defendants argue further that, to the extent Plaintiffs allege Officer Bodmer committed a constitutional violation when he assisted the Doe Defendants with lifting Green onto the portable stretcher or any action thereafter, he did so at the direction of the Doe Defendants.  *Id.*

Plaintiffs counter that "Defendants mistakenly contend that Plaintiffs' Complaint alleges that the constitutional violation occurred after John Does 1-5 took control of Mr. Green while he was receiving medical care, not while in the Officer Defendants' custody." (ECF No. 14 at 9.)  In support of their position that a constitutional violation occurred before the Doe Defendants took control of Green, Plaintiffs point to the Complaint's allegations that the first time Defendants placed Green in the prone position was while he was on the kitchen floor – before the Doe Defendants arrived to provide emergency medical services.  *Id.* (citing ECF No. 1 ¶¶ 49, 56.)

The parties' arguments as to the timing of the alleged constitutional violation raises an important foundational issue that this court must address in order to analyze Plaintiffs' excessive force claims, and that is, when the seizure of Green's person concluded.

"A 'seizure' triggering the Fourth Amendment's protections occurs only when government actors have, 'by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen.'"  *Graham,* 490 U.S. at 395, n.10 (quoting *Terry v. Ohio*, 392 U.S. 1, 19, n.16 (1968).  The Fourth Circuit does not embrace a "continuing seizure" theory under the Fourth Amendment.  *Riley v. Dorton,* 115 F.3d 1159 (4th Cir. 1997).[6]  Therefore, once a seizure concludes, so, too, does Fourth Amendment coverage.

---

[6] The *Riley* court's conclusions as to the plaintiff's entitlement to recover under the Eight Amendment based on the nature/extent of the injuries at issue there has since been abrogated by *Wilkins v.* Gaddy, 559 U.S. 34, 38-39 (2010). The *Wilkins* Court's review and holding in this aspect does not impact this court's reliance on *Riley*.

The *Riley* court explained:

> The [Fourth] Amendment establishes that "the right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated." This guarantee does not stand alone, however, but is coupled with strictures on the issuance of warrants, indicating that the Amendment is directed at the arrest of persons and not at the conditions of their custody. The requirements for securing a warrant have nothing to tell us about the conditions controlling subsequent detention. By its own terms, the Fourth Amendment thus applies to the "initial decision to detain an accused," [*Bell v. Wolfish*, 441 U.S. 520, 533-34 (1979)] not to the conditions of confinement after that decision has been made. Indeed, in defining the nature of "seizure" in the context of an arrest, the Supreme Court quoted *Thompson v. Whitman*, 85 U.S. 457, 18 Wall. 457, 471, 21 L. Ed. 897 (1874), for the proposition that "[a] seizure is a single act, and not a continuous fact." *California v. Hodari D.*, 499 U.S. 621, 625, 113 L. Ed. 2d 690, 111 S. Ct. 1547 (1991). Several of our sister circuits likewise have declined to adopt the "continuing seizure" concept and continue to apply the Fourteenth Amendment framework of *Bell v. Wolfish* rather than the Fourth Amendment to excessive force claims of pretrial detainees.

115 F.3d at 1163.

The Complaint alleges:

> Officer Woytko's report indicates that on June 1, 2021, at approximately 2:15 AM, she responded to Plaintiff Naylor's 911 call for assistance due to Mr. Green's erratic behavior. She reported that upon her arrival, Plaintiff Naylor's brother was holding Mr. Green down on the ground. She also noted "blood on the counter tops, floor, walls, cabinets and on the clothing of" Mr. Green and that Mr. Green "was actively bleeding from his right hand at the time."

> \*      \*      \*

> Officer Bodmer's report notes that he responded to the scene with Officer Woytko. He also documented radioing for Officer Siminyuk because he anticipated needing assistance putting Mr. Green into protective custody.

> \*      \*      \*

Officer Woytko noted Mr. Green was "unaware of his own emotions, bodily movements, and was posing a great danger to himself and others with his behavior." She noted that "[a]t this time, Officer Bodmer, Officer Siminyuk, and I placed the male subject into protective custody for an emergency evaluation."

\*        \*        \*

The officers reportedly subdued Mr. Green by holding his ankles down and using two sets of handcuffs to place his hands behind his back.

\*        \*        \*

Officer Woytko documented that Green "was then placed on his side in handcuffs on the floor of the kitchen until AFD arrived."

(ECF No. 1 ¶¶ 43-47.)

Officer Woytko's Field Case Report states:

In an attempt to prevent the male subject from further hurting himself or potentially hurting others, I gained control of the legs of the male subject by holding his ankles down. Officer Bodmer and Officer Siminyuk utilized two sets of handcuffs on the male subject to place his hands behind his back.  The male subject was then placed on his side in handcuffs on the floor of the kitchen until AFD arrived.

(ECF No. 6-2 at 2.)

Officer Bodmer's Supplemental Narrative states:

I then asked Off. Siminyuk if we should try to roll Mr. Green over onto his stomach so that we could detain him with his hands behind his back . . . .  Off. Siminyuk then grabbed [Green's] left arm and pulled it across his body which allowed us to roll Mr. Green onto his stomach . . . .  At approximately 0226 hours I grabbed Mr. Green's right forearm with my right hand and put my left hand behind his right tricep area in an attempt to safely get his right arm placed on his back so that we could ultimately put the other pair of handcuffs on Mr. Green's left wrist.  I was able to do this safely and Off. Siminyuk was able to grab the interlaced pair of handcuffs and attach them to Mr. Green's left wrist . . . .  Still at approximately 0226 hours, I advised APD Communications that we had Mr. Green

20

> detained.  Off. Siminyuk and I then rolled Mr. Green onto his side
> so that the left side of his body was pointing to the ceiling.

(ECF No. 6-3 at 3.)

Based on the allegations in the Complaint and the Officer Defendants' reports, the court finds, for Fourth Amendment purposes, that seizure of Green's person concluded once the officers rolled him onto his side after handcuffing him, at which point Green was restrained, not free to leave, and in the custody of the Officer Defendants as they waited for EMTs.  At that moment, Green was seized as contemplated by the Fourth Amendment.

### Reasonableness of Force

Having determined that Green was seized once officers handcuffed him and rolled him onto his side, the court must now determine whether the Officer Defendants' seizure of Green was in violation of the Fourth Amendment.

"To state an excessive force claim under the Fourth Amendment, a plaintiff must show that he was seized and that the force used was objectively unreasonable." *Parson v. Miles,* 2018 U.S. Dist. LEXIS 50100, at *14 (D. S.C. Mar. 27, 2018) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)) (explaining the "constitutional standard [that] governs a free citizen's claim that law enforcement officials used excessive force in the course of making an arrest.")  The test for reasonableness "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015) (quoting *Graham*, 490 U.S. at 396).  Three factors guide this balancing: (1) "the severity of the crime at issue;" (2) "the extent to which the suspect poses an immediate threat to the safety of the officers or others;" and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Estate of Armstrong v.*

*Village of Pinehurst*, 810 F.3d 892, 899 (4th Cir. 2016) (quoting *Graham*, 490 U.S. at 396) (internal

quotations omitted).

With respect to the first *Graham* factor, the Complaint alleges:

> On June 1, 2021, Plaintiff Naylor called 911 and requested that they respond to her and Mr. Green's residence out of concern for his safety.
>
> \*      \*      \*
>
> At the time, Mr. Green, a 51-year-old African American man, was suffering from a disturbed and impaired mental state. He was bleeding profusely from self-inflicted lacerations caused by broken glass and ceramics.
>
> \*      \*      \*
>
> At no time was Mr. Green violent or threatening toward Plaintiff Naylor or any other individual.
>
> \*      \*      \*
>
> Officer Siminyuk also stated, "[D]uring the entire process, Mr. Green was informed numerous times that he was not in trouble and that Officer Bodmer, Officer Woytko and I were only trying to help him."

(ECF No. 1 ¶¶ 38-40, 55.)

No party suggests that Green had committed a crime or that the Officer Defendants had

probable cause to effect a criminal arrest.  The Fourth Circuit explains:

> When the subject of a seizure "ha[s] not committed any crime, this factor weighs heavily in [the subject's] favor." *Bailey v. Kennedy*, 349 F.3d 731, 743-44 (4th Cir. 2003); *see also Turmon v. Jordan*, 405 F.3d 202, 207 (4th Cir. 2005) ("[T]he severity of the crime cannot be taken into account because there was no crime." (internal quotation marks omitted)). And this factor would still favor Appellant if Appellees had argued that their seizure was converted to a criminal arrest when Armstrong failed to obey the officers' lawful orders. "Even in a case in which the plaintiff ha[s] committed a  crime, when the offense [i]s a minor one, we have found that the first Graham factor weigh[s] in plaintiff's favor . . . ." *Jones v.*

> *Buchanan*, 325 F.3d 520, 528 (4th Cir. 2003) (internal quotation
> marks omitted).

*Armstrong,* 810 F.3d at 899-900.  Accordingly, the court finds that the first *Graham* factor weighs

in Plaintiffs' favor.

With respect to the second and third *Graham* factors — whether Green posed a danger to

the Officer Defendants or others, and whether he was actively resisting or attempting to flee arrest

— Plaintiffs allege:

> Officer Woytko's report indicates that on June 1, 2021, at
> approximately 2:15 AM, she responded to Plaintiff Naylor's 911
> call for assistance due to Mr. Green's erratic behavior. She reported
> that upon her arrival, Plaintiff Naylor's brother was holding Mr.
> Green down on the ground. She also noted "blood on the counter
> tops, floor, walls, cabinets and on the clothing of" Mr. Green and
> that Mr. Green "was actively bleeding from his right hand at the
> time."
>
> *       *       *
>
> Officer Woytko noted Mr. Green was "unaware of his own
> emotions, bodily movements, and was posing a great danger to
> himself and others with his behavior."

(ECF No. 1 ¶¶ 43, 45.)

Officer Woytko's Field Case Report states:

> I then spoke to miss Naylor, who advised the male subject had taken
> out the trash, and when he came back, he was acting erratically
> (yelling and banging his hand on the walls/other objects).  She
> advised the male subject was high on PCP on today's date . . . . Ms.
> Naylor asked me if the male subject could be kept at the hospital for
> at least 72 hours. She stated she "can't take any more" referring to
> his behavior and CDS usage.

(ECF No. 6-2 at 2.)

Officer Bodmer's Supplemental Narrative states:

> As I went through the living room, the kitchen was on the left, I
> observed Mr. Green to be on the floor, in front of the refrigerator,

23

on his back. There was a black male holding Mr. Green down using his left foot. The male restraining Mr. Green was later identified as Mr. Charles Stubbs Jr.  Mr. Green was screaming at this time . . . . I told Mr. Green to relax multiple times to try to get him to calm down. Mr. Green was yelling repeatedly "yeah" and "bitch" several times . . . .  Mr. Stubbs Jr. was still holding Mr. Green down. Again myself and Off. Woytko told Mr. Green to relax because he was still yelling and we were trying to communicate with him. It did not appear that Mr. Green was responding to us when telling him to relax.

Off. Woytko then advised Mr. Green to stop flailing his feet around . . . . Because Mr. Green would not stop kicking his feet into the air I radioed to any other officers that were working if anyone had leg shackles.

(ECF No. 6-3 at 2.)

Here, Green was described as "high on PCP"[7] and not in his right state of mind.  The Officer Defendants' observations that Green was bleeding, coupled with the representations made by Plaintiff Naylor, put the Officer Defendants on notice that Green was a danger to himself and others.  Additionally, Green physically resisted seizure. As the Officer Defendants attempted to calm and restrain Green to place him in protective custody, the reports indicate Green was flailing his arms, yelling, and generally uncooperative.  The second and third *Graham* factors, therefore, weigh in favor of the Officer Defendants.

Having determined that two of the three *Graham* factors weigh in the Officer Defendants' favor, and the first in favor of Plaintiffs, the court next considers "the proportionality of the force in light of all the[] circumstances"  *Armstrong,* 810 F.3d at 902 (quoting *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015)) (citations omitted).  "[F]orce justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." *Meyers*

---

[7] Phenylcyclohexyl piperidine.

*v. Balt. County*, 713 F.3d 723, 733 (4th Cir. 2013) (quoting *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005)).

Plaintiffs attempt to bring Green's seizure within the protective prohibitions of the Fourth Amendment by arguing that a constitutional violation occurred when officers placed Green on his stomach (the prone position) in the kitchen so they could handcuff him.   (ECF No. 14 at 9.) Plaintiffs rely upon *Lawhon v. Edwards*, 477 F. Supp. 3d 428 (E.D. Va. 2020), in support of their arguments regarding the force used by the Officer Defendants during the seizure of Green's person.

In *Lawhon*, the decedent, Lawhon, had a history of paranoid schizophrenia; his roommate called the police in an attempt to secure medical care for him.   477 F. Supp. 3d at 433.   Upon arrival, officers encountered Lawhon, who had noticeable, self-induced injuries, and blood on his face and shirt.   *Id.* at 433-34.   Lawhon eventually ordered the officers to leave the premises.   *Id.* at 434.   At some point, an officer directed Lawhon to put his hands behind his back, and Lawhon refused.   *Id.*   The officer "grabbed Lawhon and threw him to the ground, forcing him into the prone position face down into a pillow."   *Id.*   Thirty-seven seconds after the officer made physical contact with Lawhon, Lawhon was handcuffed with his hands behind his back.   *Id.*   The complaint, however, alleged that the officers and EMS personnel continued to hold Lawhon in the prone position, applying force to his back.   *Id.* at 435.

The *Lawhon* court found that the initial force employed to seize and secure Lawhon in handcuffs was reasonable:

> Importantly, courts have found that being placed in the prone position, alone, does not constitute deadly force. *See, e.g., Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 593-94 (7th Cir. 1997) ("For a particular application of force to be classified as 'deadly,' it must at least 'carry with it a substantial risk of causing death or serious bodily harm.' . . . Under this standard, restraining a person in a prone position, with constant monitoring, cannot be characterized, in itself, as 'deadly' force." (quoting *Robinette v.*

> *Barnes*, 854 F.2d 909, 912 (6th Cir. 1988))). Furthermore, the
> Fourth Circuit in Armstrong recognized that "[a]pplying 'just
> enough weight' to immobilize an individual 'continuing to struggle'
> during handcuffing is not excessive force." 810 F.3d at 906 n.11
> (quoting *Estate of Phillips*, 123 F.3d at 593).

477 F. Supp. 3d at 446-47.  On this basis, the *Lawhon* court concluded that the force employed

initially, until Lawhon was placed into handcuffs, was not excessive.  *Id.* at 448.

As for the force employed after Lawhon was placed in handcuffs, the court explained:

> At this stage, the Court cannot determine whether Defendants
> continued use of force—holding Lawhon down in the prone position
> for over five minutes, with allegedly all of the Defendants
> "persist[ing] in holding Mr. Lawhon in the prone position . . . ,"
> even after he exclaimed "I can't breathe"—was justified. (*See*
> Compl. ¶ 29.) Despite Defendants' assertions that Lawhon was
> resisting arrest—thrashing, screaming, and even spitting—taking
> the facts as alleged in Plaintiff's Complaint as true, Lawhon was
> sufficiently secured after being restrained in handcuffs, and the
> Defendants' continued application of force, while maintaining him
> in the prone position, allegedly caused his death. These allegations
> not only form a sufficient claim for excessive force, but it was
> clearly established in January 2018 that Defendants' alleged conduct
> constituted a Fourth Amendment violation. *See Jones*, 961 F.3d at
> 668, 671; *Meyers*, 713 F.3d at 734; *Young v. Prince George's
> County*, 355 F.3d 751, 753 (4th Cir. 2004) (finding that it could not
> conclude that the force employed by the officer after the plaintiff
> was handcuffed—including striking the back of the plaintiff's head
> and pounding his knee into his back—was reasonable); *Bailey*, 349
> F.3d at 745 ("It was especially clear that [the officers] were not
> entitled to use force after [the seized individual] was secured face
> down on the floor in handcuffs and leg restraints."); *see also
> Abdullahi v. City of Madison*, 423 F.3d 763, 769–70 (7th Cir. 2005)
> ("No one contends that deadly force was justified once [the
> decedent] was lying prone on the ground with his arms behind him
> . . . , and yet the record supports an inference that [the officer] knelt
> on [the decedent] with enough force to inflict lethal injuries.
> Accordingly, it is for a jury, and not for [the court], to weigh all the
> evidence and choose between competing inferences."); *Champion
> v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004)
> ("Creating asphyxiating conditions by putting substantial or
> significant pressure, such as body weight, on the back of an
> incapacitated and bound suspect constitutes objectively
> unreasonable excessive force.").

*Id.* at 447-48.

Unlike the plaintiff in *Lawhon*, here, Plaintiffs do not allege that the Officer Defendants exerted force upon Green during the seizure of his person; rather, they allege that the constitutional violation occurred when Green was placed into the prone position in the kitchen.  Plaintiffs do not allege any Defendant held Plaintiff in the prone position for a period of time other than that necessary to handcuff him; and there are no allegations to suggest the process was prolonged, more than momentary, more than necessary, or interrupted and resumed.  According to the Complaint and law enforcement reports incorporated therein, the Officer Defendants rolled Green onto his stomach to place the handcuffs on and then rolled him onto his side once his hands were restrained. Placing Green in the prone position to restrain his hands is not unreasonable in light of the totality of the circumstances alleged.  *See Estate of Phillips v. Milwaukee,* 123 F.3d 586, 593 (7th Cir. 1997) (finding force not excessive where plaintiff "was placed in a prone position with his hands and legs restrained because of the need to incapacitate him and to protect the safety of the officers and other witnesses from the dangers posed by his violent behavior," and explaining that "[r]estraining a person in a prone position is not, in and of itself, excessive force when the person restrained is resisting arrest"); and *Armstrong,* 819 F.3d at 906 n.10 (holding that "[a]pplying 'just enough weight' to immobilize an individual 'continu[ing] to struggle' during handcuffing is not excessive force")  (quoting *Phillips,* 123 F.3d at 593).

Because Plaintiffs do not allege facts to support a conclusion that Defendants employed an unreasonable amount of force during the seizure of Green's person, Plaintiffs' Fourth Amendment excessive force claims fail.  Defendants' Motion as to Plaintiffs' Fourth Amendment excessive force claims will, therefore, be granted.

**Excessive Force – Fourteenth Amendment**

Defendants argue that Plaintiffs do not adequately allege a constitutional interest in bodily integrity recognized under the Fourteenth Amendment.  (ECF No. 6-1 at 10.)  In contrast, Plaintiffs argue that Green had the right to bodily integrity, which Defendants violated by restraining him without lawful authority.  (ECF No. 14 at 14.)

The Complaint alleges:

> Doe & Officer Defendants unlawfully deprived Mr. Green of his rights to life, liberty, personal security, dignity, and bodily integrity, and the right to be free from physical abuse and excessive force at the hands of state actors, when they, *inter alia*, restrained Mr. Green in a face-down position to a stretcher, in contravention of clear and longstanding statewide policy described in the MIEMSS Protocols.

(ECF No. 1 ¶ 91.)  Defendants assert that the allegation in paragraph 91 of the Complaint is "merely a restatement of their excessive force claim," which is properly evaluated under the Fourth Amendment.  (ECF No. 22 at 9) (citing *Graham*, 490 U.S. 386, 395 (1989)).

As the court earlier concluded, Green was seized once the Defendant Officers handcuffed him and rolled him onto his side in the kitchen.  Once Green's seizure was complete, and he was in custody, the Fourth Amendment ceased to pertain to the scene as events continued to unfold; and the protections provided under the Fourteenth Amendment began.  *See Graham* and *Riley, supra.*  As alleged, Counts I and II contemplate that seizure of Green's person and Defendants' custody of Green coincided – that they occurred simultaneously.   As a matter of law, this is not the case. *See Graham,* 490 U.S. at 394 (stating that "[t]he validity of the claim must then be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized "excessive force" standard.)

The Complaint alleges:

28

> AFD was and is responsible for establishing customs and policies controlling the actions of its personnel, including John Does 1-5, as well as providing for their training and supervision regarding the appropriate care and treatment of individuals and patients in its custody or care.
>
> *       *       *
>
> Upon being handcuffed, shackled, or otherwise restrained by Officer and/or Doe Defendants, Mr. Green was in custody and was unable to move freely (including being unable to roll out of a face-down position) or otherwise ensure his own safety. By placing Mr. Green in their "protective custody" without his consent, Doe & Officer Defendants and Defendant City all undertook duties toward and entered a special relationship with Mr. Green by limiting his freedom to act on his own behalf, whereby they assumed an affirmative duty to protect his safety and general well-being as he was wholly dependent on the City and its agents to provide him services and care at all times relevant to this Complaint.

(ECF No. 1 ¶¶ 32, 52.)

The court agrees that Green was in custody upon being restrained (via seizure of his person).  As set forth above, once seizure ends, custody begins, as do the protections of the Fourteenth Amendment.  *Graham* explains that the standard to be applied in evaluating an excessive force claim depends upon the constitutional provision in which the claim is grounded:

> Fifteen years ago, in *Johnson v. Glick*, 481 F. 2d 1028, *cert. denied*, 414 U.S. 1033 (1973), the Court of Appeals for the Second Circuit addressed a § 1983 damages claim filed by a pretrial detainee who claimed that a guard had assaulted him without justification. In evaluating the detainee's claim, Judge Friendly applied neither the Fourth Amendment nor the Eighth, the two most textually obvious sources of constitutional protection against physically abusive governmental conduct. Instead, he looked to "substantive due process," holding that "quite apart from any 'specific' of the Bill of Rights, application of undue force by law enforcement officers deprives a suspect of liberty without due process of law." 481 F. 2d, at 1032. As support for this proposition, he relied upon our decision in *Rochin v. California*, 342 U.S. 165 (1952), which used the Due Process Clause to void a state criminal conviction based on evidence obtained by pumping the defendant's stomach. 481 F. 2d, at 1032-1033. If a police officer's use of force which "shocks the

conscience" could justify setting aside a criminal conviction, Judge Friendly reasoned, a correctional officer's use of similarly excessive force must give rise to a due process violation actionable under § 1983. *Ibid.* Judge Friendly went on to set forth four factors to guide courts in determining "whether the constitutional line has been crossed" by a particular use of force -- the same four factors relied upon by the courts below in this case. *Id.*, at 1033.

 In the years following *Johnson v. Glick*, the vast majority of lower federal courts have applied its four-part "substantive due process" test indiscriminately to all excessive force claims lodged against law enforcement and prison officials under § 1983, without considering whether the particular application of force might implicate a more specific constitutional right governed by a different standard. Indeed, many courts have seemed to assume, as did the courts below in this case, that there is a generic "right" to be free from excessive force, grounded not in any particular constitutional provision but rather in "basic principles of § 1983 jurisprudence."

We reject this notion that all excessive force claims brought under § 1983 are governed by a single generic standard.

490 U.S. at 392-93.

The *Graham* Court held:

Because petitioner's excessive force claim is one arising under the Fourth Amendment, the Court of Appeals erred in analyzing it under the four-part *Johnson v. Glick* test. That test, which requires consideration of whether the individual officers acted in "good faith" or "maliciously and sadistically for the very purpose of causing harm," is incompatible with a proper Fourth Amendment analysis.

*Id.* at 397.

The Fourth Circuit in *Riley* provides further guidance on the differing standards:

The Court had previously stated in *Gerstein v. Pugh*, 420 U.S. 103, 43 L. Ed. 2d 54, 95 S. Ct. 854 (1975), that the Fourth Amendment was the constitutional provision to use when evaluating questions of probable cause for arrest and detention. A deprivation of liberty, however, is not the same thing as a condition of detention. For "evaluating the constitutionality of conditions or restrictions of pretrial detention," the Supreme Court has specifically directed that the "proper inquiry" is "whether those conditions or restrictions

> amount to punishment of the detainee" under the Due Process
> Clause. *Bell v. Wolfish*, 441 U.S. at 535. As in *Bell*, "we are not
> concerned with the initial decision to detain an accused and the
> curtailment of liberty that such a decision necessarily entails," 441
> U.S. at 533-34, but rather with the conditions of ongoing custody
> following such curtailment of liberty.

115 F.3d at 1162.

Here, Plaintiffs' allegations invoke language that speaks to the standard applicable to a Fourth Amendment excessive force claim. The Complaint does not allege that Defendants' use of force amounted to pre-trial custodial punishment, and does not invoke language that speaks to the Fourteenth Amendment constitutional standard applicable to same; neither does their Opposition present such analysis. Said another way, Plaintiffs appear to allege that custodial/post-seizure force began upon Green being strapped to the stretcher for transport, but the Complaint fails to contend such conduct amounted to pre-trial punishment in violation of the Fourteenth Amendment. Instead, Plaintiffs appear to operate under the erroneous understanding that the Fourth and Fourteenth Amendments coincide to apply equally and simultaneously to Green's seizure and custody as one continuous event. *See Graham,* 490 U.S. at 395 n.10 (explaining that *"*the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment.") (citing *Bell v. Wolfish*, 441 U.S. 520, 535-539 (1979)). With the Complaint in its current form, Plaintiffs do not allege facts to support a claim for excessive force under the Fourteenth Amendment. Therefore, the Fourteenth Amendment claims set forth in Counts I and II will be dismissed.[8]

---

[8] Defendants argue that even if the Complaint states a Fourteenth Amendment claim against the individual Defendants, they are shielded by qualified immunity. (ECF No. 6-1 at 27.) Before addressing the qualified immunity defense, the "court must first determine whether the plaintiff has alleged the deprivation of a constitutional right." *Young v. City of Mt. Rainier*, 238 F.3d 567, 574 (4th Cir. 2001). "Only if a constitutional claim has been alleged should we proceed to the determination of whether qualified immunity shields the defendant from liability." *Id.* Because Plaintiffs fail to adequately allege a constitutional violation, the court does not reach the question of qualified immunity.

***Counts IX and X – Article 24 of the Maryland Declaration of Rights***

Counts IX and X set forth claims under Article 24 of the Maryland Declaration of Rights for deprivation of liberty through the use of excessive force and homicide.

"Article 24, which provides that 'no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land,' is *in pari materia* with the Due Process Clause of the Fourteenth Amendment." *Doe v. Dep't of Pub. Safety & Corr. Servs.*, 185 Md. App. 625, 636 (2009). "Unless there is good reason to do otherwise, 'state constitutional provisions [such as Article 24] are *in pari materia* with their federal counterparts or are the equivalent of federal constitutional provisions or generally should be interpreted in the same manner as federal provisions.'" *Allmond v. Dep't of Health and Mental Hygiene*, 448 Md. 592, 609 (Md. 2016) (quoting *Dua v. Comcast Cable of Maryland, Inc.,* 370 Md. 604, 621 (2002)). Because the court finds that Plaintiffs fail to state a claim for Fourteenth Amendment excessive force, Plaintiffs' excessive force claims brought pursuant to Article 24 of the Maryland Declaration of Rights also fail.[9]

### D.  Counts III and IV – *Monell* Claims

Counts III and IV assert 42 U.S.C. § 1983 *Monell* claims against the City based on an "unconstitutional policy or custom/failure-to-train and supervise" the Doe and Officer Defendants. (ECF No. 1 at 22-27.)

In *Monell v. Department of Social Services*, the Supreme Court concluded that Congress intended "municipalities and other local government units to be included among those persons to whom § 1983 applies." 436 U.S. 658, 690 (1978). The Court further explained that "[l]ocal

---

[9] The Complaint does not include a claim for violation of Article 26 of the Maryland Declaration of Rights – the state counterpart to the Fourth Amendment to the United States Constitution.

governing bodies [] can be sued directly under § 1983 for monetary, declaratory, or injunctive relief, where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* Liability, however, attaches ""only where the municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

Fourth Circuit "law is quite clear . . . that a section 1983 failure-to-train claim cannot be maintained against a governmental employer in a case where there is no underlying constitutional violation by the employee." *Young v. City of Mt. Rainier*, 238 F.3d 567, 579 (4th Cir. 2001) (concluding that because there is no alleged "constitutional violation on the part of any law enforcement officer, the district court properly dismissed the failure-to-train claims asserted against the governmental employers"); *Grayson v. Peed*, 195 F.3d 692, 697 (4th Cir. 1999) (finding that the claims against the county fail because "there are no underlying constitutional violations by any individual" and therefore, "there can be no municipal liability"); *Temkin v. Frederick County Comm'rs*, 945 F.2d 716, 724 (4th Cir. 1991) (holding that "[a] claim of inadequate training under section 1983 cannot be made out against a supervisory authority absent a finding of a constitutional violation on the part of the person being supervised"); *Belcher v. Oliver*, 898 F. 2d 32, 36 (4th Cir. 1990) (explaining that "[b]ecause it is clear that there was no constitutional violation we need not reach the question of whether a municipal policy was responsible for the officers' actions") *Estate of Billups v. Baker*, No. 5:22-CV-206-FL, 2023 U.S. Dist. LEXIS 35133, at *9 (E.D.N.C. Mar. 2, 2023) (concluding that plaintiff failed to state a failure to train or supervise claim "[w]here there is no underlying constitutional violation alleged"); *see also Roach v. Fredericktown*, 882 F.2d 294, 298 (8th Cir. 1989) (finding no inadequate training claim absent a constitutional violation because "in order for municipal liability to attach in a

situation such as this, there must first be an underlying violation of the plaintiff's constitutional rights by a municipal employee (for whose actions the City is, presumably, to be held accountable)").

Therefore, absent a viable constitutional claim against the Doe and/or Officer Defendants, Plaintiffs cannot state a *Monell* claim. *See Young*, 238 F.3d at 580 (concluding that the alleged conduct of the individual defendants "does not amount to a constitutional violation" and "the absence of any viable constitutional claim against the individual defendants prevent[s] the claims from being asserted against the governmental employers"). Because the court concludes that Plaintiffs fail to state an underlying constitutional violation by the Doe and/or Officer Defendants, the Motion will be granted as to Counts III and IV.

### E.   Counts V and VI – Conspiracy to Deprive Constitutional Rights – 42 U.S.C. § 1985(3) and Failure to Intervene - 42 U.S.C. § 1983

***Conspiracy to Deprive Constitutional Rights***

Section 1985 of Title 42 of the United States Code provides in relevant part:

> If two or more persons . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

To state a section 1985(3) conspiracy claim, a plaintiff must allege:

> "(1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy."

*Simmons v. Poe*, 47 F.3d 1370, 1377 (4th Cir. 1995) (citing *Buschi v. Kirven*, 775 F.2d 1240, 1257 (4th Cir. 1985)).

It is well settled that a section 1985 conspiracy claim requires that a plaintiff "show an agreement or a 'meeting of the minds' by defendants to violate the [plaintiff]'s constitutional rights." *Id.* (citing *Caldeira v. County of Kauai*, 866 F.2d 1175, 1181 (9th Cir. 1989)). The Fourth Circuit "has rarely, if ever, found that a plaintiff has set forth sufficient facts to establish a § 1985 conspiracy." *Id.* Moreover, where the existence of a conspiracy is alleged in a conclusory manner, the Fourth Circuit has found the claim fails pursuant to Rule 12(b)(6). *Id; see also Sellner v. Panagoulis*, 565 F. Supp. 238, 248 (D. Md. 1982) (finding that the plaintiff's section "1985 claims fail because he has alleged the existence of conspiracies in only the most conclusory way and has not supported his allegations of conspiracy by reference to material facts.").

Here, Defendants argue that Plaintiffs fail to allege the requisite discriminatory animus or agreement among conspirators in support of their conspiracy actions at Counts V and VI. (ECF No. 6-1 at 14.)

Plaintiffs allege:

> Doe & Officer Defendants, by their concerted actions, conspired, confederated, and agreed to violate Mr. Green's constitutional rights through their overt acts alleged herein (i.e., restraining and strapping Mr. Green to a stretcher in a face-down position), and these overt acts were performed in furtherance of the conspiratorial objective.

> \*      \*      \*

> Doe & Officer Defendants' joint concerted overt acts caused the deprivation of Mr. Green's rights, as identified herein.

> \*      \*      \*

> In the alternative, Doe & Officer Defendants, by their concerted actions, conspired and confederated to deprive Mr. Green of his

> constitutional rights by acquiescing to the actions of their coconspirators by watching them openly breach the law (i.e., by strapping Mr. Green to a stretcher in a face-down position) while doing nothing to seek its prevention, and their actions were objectively unreasonable, reckless, deliberately indifferent, and shock the conscience.
>
>        \*     \*     \*
>
> By their overt actions in furtherance of the conspiracy to deprive Mr. Green of his constitutional rights or by acquiescing to their coconspirators overt unlawful acts while failing to intervene, Doe & Officer Defendants shared the same conspiratorial objective.
>
>        \*     \*     \*
>
> By their joint and concerted overt actions in furtherance of the conspiratorial objective and/or their acquiescence thereto, Doe & Officer Defendants are liable for the constitutional violations committed against Mr. Green.

(ECF No. 1 ¶¶ 132-136.)

The Complaint does not set forth allegations of the sort to suggest "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckinridge*, 403 U.S. 88, 102-103 (1970); *see Facey*, 992 F. Supp. 2d at 541 (holding that allegation that individuals were motivated by the plaintiff's "race and national origin lacks any concrete supporting facts"). Further, the Complaint lacks adequate allegations to support a conclusion that the Doe and Officer Defendants conspired, participated in, or took steps in furtherance of, a plan to deprive Green of his constitutional rights. Finally, although the court need not reach the more jurisprudentially complex (and perhaps controversial) issue of whether 1985(3) presents a remedial versus substantive right, because the court has concluded that Plaintiffs fail to state Fourth and Fourteenth Amendment claims, Counts V and VI likewise fail under either scenario. The Motion will be granted as to Plaintiffs' section 1985(3) conspiracy claims in Counts V and VI.

*Failure to Intervene – Bystander Liability*

The Fourth Circuit "has recognized 'bystander liability' as an independent cause of action by which a police officer may violate a plaintiff's constitutional right to be free from excessive force when the officer witnesses 'a fellow officer's illegal act . . . possesses the power to prevent it . . . and chooses not to act.'" *Beasley v. Kelly*, No. DKC 10-0049, 2011 WL 4711910, at *8 (D. Md. Oct. 4, 2011) (quoting *Randall v. Prince George's Cnty.*, 302 F.3d 188, 203-204 (4th Cir. 2002)). "[A]n officer may be liable under § 1983, on a theory of bystander liability, if he: (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Randall*, 302 F.3d at 204. A defendant, however, "cannot be held liable for both participating in the injury and failing to prevent the injury." *Weeden v. Prince George's Cty.*, 2018 U.S. Dist. LEXIS 95469, at *5 (D. Md. June 4, 2018); *see Jones v. Chapman*, No. ELH-14-2627, 2017 WL 2472220. at *35 (D. Md. June 7, 2017) ("As a preliminary matter, if the officers 'participate[d] in the fray' . . . as plaintiffs claim, then they were not acting as bystanders.").

Here, Defendants argue Plaintiffs' failure to intervene claims fail because a claim "cannot rely on 'indeterminate assertions against all [D]efendants.'" (ECF No. 6-1 at 14; quoting *Jien v. Perdue Farms, Inc.,* 2020 WL 5544183, at *4 (D. Md. Sept. 16, 2020), and *SD3, LLC v. Black & Decker (U.S.), Inc.,* 801 F.3d 412, 423 (4th Cir. 2015).) Citing *Jones* and *Weeden, supra,* Defendants further argue that Plaintiffs cannot have it both ways – which is to say, if an officer engages in the principal bad act, he cannot also be a bystander who fails to intervene. (ECF No. 6-1 at 14.) Defendants are correct on both fronts. In counter, Plaintiffs urge that their failure to intervene claims are an exercise in alternative pleading, and that these claims therefore "cannot be

dismissed for not specifying which officers failed to intervene and which officers actively participated." (ECF. 14 at 22 and 22 n.13.)

Importantly, Plaintiffs allow that bystander liability claims may not proceed "if no use of excessive force is found." (ECF No. 14 at 22.) Because the court concludes that Plaintiffs fail to state Fourth Amendment excessive force claims as a matter of law (and Fourteenth Amendment claims arising out of the same allegations), the bystander claims set forth in Counts V and VI likewise fail. *See Hinkle v. City of Clarksburg*, 81 F.3d 416, 420 (4th Cir. 1996) (declining to address the non-shooting officer's liability where there is no underlying use of excessive force); *McLenagan v. Karnes*, 27 F.3d 1002, 1008 (4th Cir. 1994) (explaining if non-shooting officer's action or failure to act contributed to use of force, issue of liability mooted by finding that shooting officer's "actions did not transgress the Fourth Amendment"). The Motion will be granted as to Plaintiffs' section 1983 failure to act/bystander liability claims in Counts V and VI.

### F.    Counts VII and VIII – Deliberate Indifference to Serious Medical Needs – 42 U.S.C. § 1983

Counts VII and VIII of the Complaint set forth claims of deliberate indifference to serious medical needs in violation of the Due Process clause against all Defendants. (ECF No. 1.)

*Defendant City*

Defendants first argue that Counts VII and VIII are "improperly lodged" against the City, because *respondeat superior* principles have no place in section 1983's framework and application. (ECF No. 6-1 at 15.) In response, Plaintiffs argue that the City is properly named because the alleged constitutional violations by the Officer and Doe Defendants flowed from an official policy or custom. (ECF No. 14 at 23.) The court agrees with Defendants.

"Municipalities are not liable under *respondeat superior* principles for all constitutional violations of their employees simply because of the employment relationship." *Spell v. McDaniel*,

824 F.2d 1380, 1385 (4th Cir. 1987) (citing *Monell*, 436 U.S. at 692-94).  To the extent Plaintiffs assert that the City is liable under 42 U.S.C. § 1983 for the constitutional torts of its law enforcement officers and EMS workers, the proper vehicle is a *Monell* claim.[10]  The Motion will be granted as to Counts VII and VIII as against Defendant City.

### *Individual Defendants*

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' . . . proscribed by the Eighth Amendment."  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). "However, a pretrial detainee's claim of constitutionally inadequate medical care is governed by the Fourteenth Amendment, rather than the Eighth Amendment."  *Stevens v. Holler*, 68 F.4th 921, 931 (4th Cir. 2023) (citing *Mays v. Sprinkle*, 992 F.3d 295, 300 (4th Cir. 2021)).  "Although 'the precise scope of this Fourteenth Amendment right remains unclear[,] . . . a pretrial detainee makes out a violation at least where [the detainee] shows deliberate indifference to serious medical needs under cases interpreting the Eighth Amendment.'"  *Id.* (quoting *Mays*, 992 F.3d at 300).

"To state such a claim, the detainee 'must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.'"  *Stevens*, 68 F.4th at 931 (quoting *Estelle*, 429 U.S. at 106).  "Deliberate indifference is a high standard and 'the mere negligent or inadvertent failure to provide adequate care is not enough.'"  *Id.* (quoting *DeShaney v. Winnebago Cnty. Dep't. of Soc. Serv.*, 489 U.S. 189, 198 n.5 (1989).  A deliberate indifference claims requires both objective and subjective elements: "(1) Decedent was exposed to a substantial risk of serious

---

[10] Even if Plaintiffs properly brought a *Monell* claim on the basis of deliberate indifference in violation of the Due Process clause, absent an underlying constitutional violation, there can be no liability on the part of Defendant City. *See* Section IV.D., *supra*.

harm (the objective prong); and (2) the prison official knew of and disregarded that substantial risk to the inmate's health or safety (the subjective prong)." *Id.*

The precise issue is whether the Complaint sufficiently alleges that the Officer and Doe Defendants were deliberately indifferent to Green's medical needs or to a substantial risk of harm faced by Green. *Young v. City of Mt. Rainier*, 238 F.3d 567, 575 (4th Cir. 2001). Defendants argue that Plaintiffs fail to adequately allege that "the Individual Defendants deliberately ignored a serious medical condition that was obvious or known to each of them." (ECF No. 6-1 at 21.) Plaintiffs counter that the Officer and Doe Defendants violated Green's constitutional rights by their indifference to his serious medical needs brought about by placing him in the restrained face-down position for a prolonged period of time. (ECF No. 14 at 24.) *Young v. City of Mt. Rainier* is instructive.

In *Young*, the Fourth Circuit addressed whether the complaint sufficiently alleged that an officer acted with deliberate indifference to the decedent's medical needs or to a substantial risk of harm faced by the decedent. 238 F.3d at 575. The *Young* court concluded that the complaint insufficiently alleged a constitutional violation premised on the theory that "Young died from positional asphyxiation caused by the combination of pepper spray, restraints, and face-down positioning." *Id.* at 576. The *Young* court explained:

> As noted above, the original complaint does not allege that Deputy Bunner suspected Young was under the influence of PCP when Young was taken into custody. Moreover, the complaint does not allege that Young lost consciousness, was ever in distress while being transported to the hospital, or, perhaps even more fundamentally, that Young died from asphyxiation. Instead, the complaint alleges the cause of death posited in the autopsy report: sudden cardiac arrhythmia possibly caused by "a combination of the stimulant drug intoxication . . . and the physical restraint for his violent behavior."

*Id.*

The court noted that even if Young died from positional asphyxiation, the complaint contained no allegations to suggest the officers were deliberately indifferent:

> Reading the original complaint in the light most favorable to the Parents and giving the Parents the benefit of all reasonable inferences, as we are required to do at this stage of the proceedings, *see, e.g.*, *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999), the complaint simply establishes that Young struggled with law enforcement officers, was sprayed with pepper spray, restrained, transported to a hospital in a prone position, and died sometime thereafter. While the complaint alleges that the officers knew or should have known about the potential problems with the use of pepper spray and restraints on PCP users, these allegations, particularly absent any suggestion that Young exhibited any distress during the time he was in the custody of the officers, at most support an inference that the defendants were negligent in some unidentified way. Negligence, however, is insufficient to support a claim of a Fourteenth Amendment violation. *See Lewis*, 523 U.S. at 849; *Grayson*, 195 F.3d at 695.
>
> To be sure, the original complaint throws in words and phrases such as "deliberate indifference," "malicious," "outrageous," and "wanton" when describing the conduct of the officers. The presence, however, of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6) when the facts alleged in the complaint cannot support a finding of deliberate indifference. *See Payne v. Churchich*, 161 F.3d 1030, 1041 (7th Cir. 1998) (dismissing Fourteenth Amendment claim even though "the complaint contains the single cursory allegation" of deliberate indifference where "the conduct alleged to support that claim constitutes negligence and nothing more"); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996) (noting that "bald assertions and conclusions of law" do not prevent dismissal of a complaint under Rule 12(b)(6)); *Frey v. City of Herculaneum*, 44 F.3d 667, 671 (8th Cir. 1995) (explaining that although pleadings must be liberally construed, "at the very least . . . the complaint must contain facts which state a claim as a matter of law and must not be conclusory."). The original complaint does not allege the existence of a substantial risk of serious harm to Young known to and disregarded by Deputy Bunner or the existence of any serious medical needs known to and disregarded by Bunner. The original complaint, therefore, fails to allege the deliberate indifference required to sustain the Parents' Fourteenth Amendment claims and the constitutional claims asserted against Deputy Bunner were properly dismissed.

238 F.3d at 576-77.

In the instant case, Plaintiffs allege:

> Officer Defendants treated Mr. Green as a combative criminal suspect instead of treating him as a person requiring immediate medical care. Officer Defendants immobilized Mr. Green on the ground, face-down, and placed his arms behind his back with two sets of handcuffs and restrained his legs with shackles. Officer Bodmer then provided Doe Defendants with a strap, which was used to restrain Mr. Green to a stretcher, and Sergeant Cochran provided Doe Defendants with an additional set of handcuffs, even after Mr. Green was already restrained in a face-down position.

> *     *     *

> Officer Defendants were deliberately indifferent to Mr. Green's life and safety when they caused Mr. Green to be restrained in a face-down position and then failed to prevent and intervene when AFD Defendants transferred and then restrained Mr. Green in a face-down position to a stretcher for an extended period despite known long-standing protocols prohibiting such restraint because of its dangerous and deadly consequences, and despite obvious signs of distress from Mr. Green.

> *     *     *

> As reflected by the times documented in the Officer Defendants' reports, Mr. Green had already been moved to a face-down position by 2:34 AM, when he was transferred to the stretcher, and remained restrained in that face-down position for seven (7) additional minutes, until 2:41 AM, when a paramedic reportedly turned his head. Mr. Green then remained face-down for another four (4) minutes, from 2:41 to 2:45 AM.

> *     *     *

> Officer Defendants disregarded Mr. Green's incapacitated psychiatric and emotional state by handcuffing his wrists behind his back and shackling his ankles, and then assisting or failing to intervene when Mr. Green was restrained in a face-down position on a stretcher. Under these circumstances, the prolonged and extended use of maximum physical restraint combined with assisting or failing to intervene when Mr. Green was placed in a deadly face-down position on a stretcher—in contravention of

established constitutional rights and medical practice—constituted deliberate indifference to serious medical needs.

\*     \*     \*

Doe Defendants disregarded Mr. Green's incapacitated psychiatric and emotional state and failed to treat him as a person requiring immediate medical care. Instead of providing Mr. Green with medical assistance, Doe Defendants endangered Mr. Green's life and safety by leaving him handcuffed and shackled in a face-down position while they strapped him face down onto a stretcher, placed additional handcuffs on him, and kept him in a face-down position for eleven (11) minutes. Under these circumstances, the prolonged and extended use of maximum physical restraint, combined with adding additional restraints to Mr. Green after he was already face-down and immobilized, constituted deliberate indifference to a serious medical need.

\*     \*     \*

The deliberate indifference of Officer and Doe Defendants to Mr. Green's serious medical needs shocks the conscience and shows knowledge of the risk of harm and intent to act in a manner that foreseeably and substantially increased the risk of serious harm and death.

(ECF No. 1 ¶¶ 156-58, 164-66.)  Plaintiffs further allege that the Officer Defendants observed Green being strapped down but failed to intervene.  *Id.* ¶¶ 160-63.

Taken in the light most favorable to Plaintiffs, the Complaint alleges that Green was suffering from a disturbed and impaired mental state; the Defendant Officers responded and subdued Green by handcuffing him; he was placed into the prone position; and transported to the hospital.  The Police Reports and Supplemental Narratives further provide that at 2:40 a.m. Green was "still  yelling and was lifting his chest off of the stretcher while AFD was wheeling him around to the back of the ambulance."  (ECF No. 6-3 at 4.)  At 2:41 a.m., the Doe Defendants loaded Green into the ambulance and continued to render aid to Green.  *Id.*

To the extent Plaintiffs maintain that the Officer and Doe Defendants were indifferent to Green's serious need of medical care, the Complaint and the Police Reports (quoted in the Complaint for their truth) do not plausibly bear out such a conclusion; rather the allegations and incorporated/quoted police reports aver that Green was maintained on his side to keep his airway clear upon being handcuffed; that he was transported on a sheet while prone to get him to the ambulance; and that he was turned onto his backside before being strapped into the ambulance – before which it was visually, manually and verbally confirmed that Green was conscious and alert, and that his nose was clear and airway open. (ECF No. 1 ¶¶ 45, 50, 68.) Indeed, the Complaint alleges that, upon Plaintiff Naylor's understandable request for emergency assistance because Green appeared to pose a danger to himself and others, officers placed him into protective custody for an emergency evaluation. *Id.* ¶ 45. Moments later, AFD arrived and attended to Green's injured hand. *Id.* ¶ 50. Officer Woytko put Green under an emergency petition. *Id.* ¶ 59. AFD continued to render aid while he was in the ambulance. (ECF No. 6-3 at 4.) Green was transported to AAMC, where AAMC staff continued to render aid, took custody of Green, and Mobile Crisis was notified of the emergency evaluation. (ECF No. 1 ¶¶ 68, 70.)

These allegations, in conjunction with the police reports, do not plausibly bear out of suggest "the existence of a substantial risk of serious harm to [Green] known to and disregarded by [the Doe and Officer Defendants] or the existence of any serious medical needs known to and disregarded by [the Doe and Officer Defendants]." *Young*, 238 F.3d at 577. While Plaintiffs appear to argue that the Doe and Officer Defendants knew or should have known about the potential dangers of placing Green (or anyone) in the prone position, such an allegation is insufficient to state a claim of a deliberate indifference under the Fourteenth Amendment. *See Young*, *supra*; *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999) (noting that "the Constitution

is designed to deal with deprivations of rights, not errors in judgment, even though such errors may have unfortunate consequences. This is precisely why the Supreme Court has seen fit to stress that deliberate indifference requires 'more than ordinary lack of due care for the prisoner's interests or safety.'") (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).

The Motion will be granted as to Counts VII and VIII.

### G.    Counts XI and XII – Assault and Battery

#### 1.    *Assault*

Plaintiffs concede that their claims for assault set forth in Counts XI and XII should be dismissed because they were filed more than one year from the date of the incident.  The court agrees.  *See* MD. CODE ANN., CTS. & JUD. PROC. § 5-105 ("An action for assault, libel, or slander shall be filed within one year from the date it accrues.").  The Motion will be granted as to the assault claims in Count XI and XII.

#### 2.    *Battery*

##### i.    *The City*

Plaintiffs advise: "it is not the intention of Plaintiffs to sue the City of Annapolis directly for a claim of battery." (ECF No. 14 at 33.)  Therefore, the Motion will be granted as to the battery claim in Counts XI and XII against Defendant City.

##### ii.    *Officer Defendants*

In Maryland, "[a] battery occurs when one intends a harmful or offensive contact with another without that person's consent." *Nelson v. Carroll*, 355 Md. 593, 600 (1999).  "A battery may occur through a defendant's direct or indirect contact with the plaintiff." *Id.*  "However, intent is required; mere accidental or inadvertent conduct that results in harmful contact with another does not rise to the level of assault or battery." *Wolfe v. Columbia Coll., Inc.*, 2021 U.S. Dist.

LEXIS 125308, at *37 (D. Md. July 6, 2021).  At the pleading stage, a plaintiff must allege "instances of nonconsensual contact that were harmful or offensive." *Id.*

"An officer is not liable for battery for using a reasonable amount of force when effectuating a lawful detention or arrest." *Stutzman v. Krenik*, 350 F. Supp. 3d 366, 383 (D. Md. 2018) (citing *Ashton v. Brown*, 339 Md. 70, 119 n.24 (Md. 1995)) (citations omitted).  "However, if during a valid arrest 'an officer uses excessive force, or force greater than is reasonably necessary under the circumstances, the officer may be liable' for battery." *Id.* (citing *French v. Hines*, 182 Md. App. 201, 266 (2008)).

Plaintiffs allege:

> Defendants assaulted and battered Mr. Green when they unlawfully restrained Mr. Green in a face-down position and unlawfully strapped him in a face-down position to a stretcher.
>
> \*      \*      \*
>
> Defendants intentionally touched Mr. Green in a harmful or offensive manner when they strapped him in a face-down position to the stretcher. Mr. Green did not give Defendants permission to touch him in that or any other manner.
>
> \*      \*      \*
>
> Defendants' conduct was without legal justification and was purposeful. Defendants acted as Defendant City's agents, servants, and/or employees when they assaulted and battered Mr. Green.

(ECF No. 1 ¶¶ 199, 201-202.)

Defendants argue that the Officer Defendants cannot be held liable for battery because Plaintiffs do not allege it was unlawful for the Officer Defendants to place Green in protective custody, and the Officer Defendants did not participate in placing Green face-down on the stretcher.  (ECF No. 6-1 at 22.)  To the extent Plaintiffs' allegation that "Defendants . . . battered Mr. Green when they unlawfully restrained [him] in a face down position" refers to the Officer

Defendants rolling Green onto his belly while he was laying on the kitchen floor in order to handcuff him, the court has already found that such actions did not violate the Fourth Amendment. *See* Section IV.C., *supra*.

Because the court finds that the Officer Defendants did not unlawfully seize Plaintiff under the Fourth Amendment (and that Plaintiffs fail to state a claim under the Fourteenth Amendment for the force used during the incident), the Officer Defendants' physical touching of Green during seizure of his person in order to place him in protective custody does not suffice as the nonconsensual offensive touching element of a battery claim. The Motion as to Counts XI and XII for battery will be granted as against the Officer Defendants.

### iii.    Doe Defendants

Defendants also argue that, to the extent Plaintiffs state a battery claim against the Doe Defendants, they are entitled to immunity pursuant to the Fire and Rescue Companies Act. (ECF No. 6-1 at 30.)

The Fire and Rescue Company Act provides in part:

> Notwithstanding any other provision of law, except for any willful or grossly negligent act, a fire company or rescue company, and the personnel of a fire company or rescue company, are immune from civil liability for any act or omission in the course of performing their duties.

MD. CODE ANN., CTS. & JUD. PROC. § 5-604(a). The statute applies to municipal fire and rescue departments, and their employees. *Mayor & City Council of Baltimore v. Chase*, 360 Md. 121, 123 (2000). Plaintiffs allege that the Doe Defendants are employed as paramedics and/or emergency responders with the AFD's EMS division. (ECF No. 1 ¶ 31.) Therefore, the Doe Defendants fall within the protections of the Fire and Rescue Companies Act.

To counter this protection, Plaintiffs argue that the Fire and Rescue Company Act does not provide immunity to the Doe Defendants for intentional torts.  (ECF No. 14 at 54.)  Plaintiffs cite no authority in support of this proposition.  In construing and analyzing application of the Fire and Rescue Company Act, "the cardinal rule is to ascertain and effectuate legislative intent."  *Chase*, 360 Md. 121, 128 (2000).  The court first looks to "the words of the statute and, ordinarily, when the words of the statute are clear and unambiguous, according to their commonly understood meaning" the inquiry ends.  *Id.*  Here, the plain language of the statute provides that, absent an alleged willful or grossly negligent act, the Doe Defendants are immune "for any act or omission in the course of performing their duties."  MD. CODE CTS. & JUD. PROC. § 5-604(a).  Nothing in the statute suggests it does not apply to claims for intentional torts.

Plaintiffs additionally argue that the Doe Defendants should not be entitled to immunity under the Fire and Rescue Company Act because they violated MIEMSS protocols.  (ECF No. 14 at 54.)  Plaintiffs cite no authority for this proposition, and the court aware of none.  Indeed, the Appellate Court of Maryland held in *McCoy v. Hatmaker*:

> Medical protocols seek to establish best practices for successfully treating certain conditions. Failure to follow such protocols might sometimes be deliberate, but more often than not, we believe, such failure to heed them during an emergency would be purely accidental and, therefore, at most simple negligence.

135 Md. App. 693, 713 (2000).  As set forth in detail in Section IV.I., *infra*, the court finds that Plaintiffs fail to adequately allege that the Doe Defendants acted with gross negligence.  Absent effective allegations of gross negligence against the Doe Defendants, the Doe Defendants are entitled to immunity pursuant to the Fire and Rescue Company Act.

The Motion as to Counts XI and XII for battery against the Doe Defendants will be granted.

### H.    Counts XIII and XIV – Negligence

Counts XIII and XIV set forth negligence claims against all Defendants.  (ECF No. 1.)  As an initial matter, Plaintiffs concede that Counts XIII and XIV were improperly brought against Defendant City.  (ECF No. 14 at 34.)  Accordingly, Counts XIII and XIV will be dismissed as against Defendant City.

"To plead negligence in Maryland, a plaintiff must 'allege with certainty and definiteness, facts and circumstances sufficient to set forth (a) a duty owed by the defendant to the plaintiff, (b) a breach of that duty and (c) injury proximately resulting from that breach.'" *Fletcher v. Md. Transit Admin.*, 741 F. App'x 146, 149 (4th Cir. 2018) (quoting *Pace v. State*, 425 Md. 145, 154 (Md. 2012)).  "The existence of a duty is a matter of law that a court may dispose of on a motion to dismiss." *Id.*

"To determine if a duty exists, Maryland state courts consider 'the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties.'" *Fletcher*, 741 F. App'x at 149 (quoting *Pace*, 425 Md. at 156).  There are various factors the courts consider:

> the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.

*Ashburn v. Anne Arundel Cnty.*, 306 Md. 617, 627 (1986).  "While foreseeability is often considered among the most important of these factors, its existence alone does not suffice to establish a duty under Maryland law." *Remsburg v. Montgomery*, 376 Md. 586, 583 (2003).

Relevant here, the public duty doctrine provides that "when a statute or common law 'imposes upon a public entity a duty to the public at large, and not a duty to a particular class of individuals, the duty is not one enforceable in tort.'" *Muthukumarana v. Montgomery County*, 370 Md. 447, 486 (2002) (quoting Dan B. Dobbs, THE LAW OF TORTS § 271 (2000) (footnote omitted)). If, however, a plaintiff "alleges sufficient facts to show that the defendant policeman created a 'special relationship' with him upon which he relied, he may maintain his action in negligence." *Ashburn*, 306 Md. at 630-31; *see also Muthukumarana,* 370 Md. at 486-88.  This is often referred to as the "special duty rule" and "[i]n order for a special relationship between police officer and victim to be found, it must be shown that the local government or the police officer affirmatively acted to protect the specific victim or a specific group of individuals like the victim, thereby inducing the victim's specific reliance upon the police protection." *Id.* at 630.

In the context of law enforcement officers, *Ashburn* provides:

> Thus, we recognize the general rule, as do most courts, that absent a special relationship between police and victim, liability for failure to protect an individual citizen against injury caused by another citizen does not lie against police officers. Rather, the duty owed by the police by virtue of their positions as officers is a duty to protect the public, and the breach of that duty is most properly actionable by the public in the form of criminal prosecution or administrative disposition. As the District of Columbia Court of Appeals stated in *Morgan v. District of Columbia*, *supra*, 468 A.2d at 1311:
>
> > [P]ublic officials who act and react in the milieu of criminal activity where every decision to deploy law enforcement personnel is fraught with uncertainty must have broad discretion to proceed without fear of civil liability in the unflinching discharge of their duties. As the Connecticut Supreme Court recognized the public interest is not served by allowing a jury of lay (persons) with the benefit of 20/20 hindsight to second-guess the exercise of a police [officer]'s discretionary professional duty. Such discretion is no discretion at all.

* * *

> [I]f the police were held to a duty enforceable by each individual member of the public, then every complaint – whether real, imagined, or frivolous would raise the spectre of civil liability for failure to respond. Rather than exercise reasoned discretion and evaluate each particular allegation on its own merits the police may well be pressured to make hasty arrests solely to eliminate the threat of personal prosecution by the putative victim. Such a result historically has been viewed, and rightly so, as untenable, unworkable and unwise.

> Furthermore, a policy which places a duty on a police officer to insure the safety of each member of the community would create an unnecessary burden on the judicial system.

*Ashburn*, 306 Md. at 628-60 (internal citations and quotation marks omitted).

While *Ashburn's* analysis is limited to the special duty rule in the context of law enforcement, the rule is not limited to law enforcement; rather it encompasses and applies broadly to emergency personnel and emergency responders. *Muthukumarana v. Montgomery Cnty.*, 370 Md. 447, 488 (2002) (applying *Ashburn* and the special relationship duty in the context of a 911 dispatcher, and providing in-depth analysis on application of the special relationship duty beyond law enforcement).

Here, Defendants argue that Plaintiffs do not sufficiently plead a duty owed to Green beyond the general duty owed to the public at large (per the public duty doctrine). Therefore, Defendants urge, Plaintiffs may not pursue their negligence claims against the Officer and Doe Defendants, because the duty on which those claims rest is not "'enforceable in tort.'" (ECF No. 6-1 at 22-23, quoting *Muthukumarana*, 370 Md. at 486.) Specifically, Defendants argue that Plaintiffs fail to plead facts giving rise to the requisite special relationship between any Officer or Doe Defendant and Green, and Green's specific reliance on same. *Id.* Plaintiffs counter that the

Officer and Doe Defendants created a special relationship with Green by placing him in protective custody, which included physical restraints; therefore, the Doe and Officer Defendants owed Green a duty "to ensure his safety and well-being while in their care." (ECF No. 14 at 35.) The court agrees with the defense.

The Complaint fails to plausibly allege that any of the Doe or Officer Defendants took affirmative steps – through conduct or words – to promise or assure Green that they would protect him from some harm; that they specifically or uniquely undertook to act for his benefit; or that they made a promise to induce (or which did induce) his reliance on same. *Ashburn,* 306 Md.at 631-32. While responding officers and emergency responders surely address the needs of the specific citizen to whom duty may call them, and while surely those events may start off or become dangerous in the moment, that is the nature of the job. That is the essence – the starting point – of every officer or EMT relationship with every member of the public. By its natural extension, Plaintiffs' argument – that the Officer and Doe Defendants created a special relationship with Green by virtue of placing him in protective custody under physical restraint (even were it to an unconstitutional extent) – transforms the exception into the rule. That is not the law.

Moreover, importantly, the special relationship doctrine "is applied only when a duty exists to control the conduct of a third person." *Gray v. Kern*, 124 F. Supp. 3d 600, 611 (D. Md. 2015); *see Doe v. Montgomery Cnty. Bd. of Educ.*, 2021 U.S. Dist. LEXIS 244900, at *29 (D. Md. Dec. 23, 2021) (explaining that the special relationship doctrine arises "when the state and the aggrieved individual have a special relationship whereby the state has an affirmative duty to protect the individual from harm inflicted by third parties"). Therefore, the special relationship exception "arises when a victim brings an action against a police officer for an injury caused by a third person." *Gray*, 124 F. Supp. 3d at 611.

Here, Plaintiffs allege that the Officer and Doe Defendants had an affirmative duty to protect Green from harm, specifically "to avoid causing foreseeable physical or mental injuries to him." (ECF No. 1 ¶ 211.)  Plaintiffs, however, allege that the Officer and Doe Defendants directly caused harm to Green – not by a failure to prevent harm at the hands of a third party.  Therefore, even if a special relationship were adequately pled, it would not result in a cognizable negligence claim given the allegations of harm.  Plaintiffs' available remedies, if any, must be found in federal and state constitutional torts, not negligence.  The Motion will be granted as to Counts XIII and XIV.

## I.       Counts XV and XVI – Gross Negligence

As an initial matter, Plaintiffs concede that Counts XV and XVI are improperly brought against the Defendant City.  (ECF No. 14 at 35.)  Accordingly, Counts XV and XVI will be dismissed as against Defendant City.  With regard to these claims as against the Individual Defendants, Defendants argue that, to survive a motion to dismiss, Plaintiffs must plead facts that demonstrate conduct extraordinary or outrageous in character.  (ECF No. 6-1 at 23.)

"Under Maryland law, gross negligence is 'something more than simple negligence, and likely more akin to reckless conduct.'" *Stutzman v. Krenik*, 350 F. Supp. 3d 366, 383 (D. Md. 2018) (quoting *Barbre v. Pope*, 402 Md. 157, 187 (Md. 2007)).  "It is 'an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them.'" *Id.*  "An individual acts with gross negligence when that person 'inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist.'" *Id.*

"In the context of gross negligence claims alleging excessive force, the [Supreme Court of Maryland] has held that the principle of objective reasonableness as articulated in *Graham*[11] controls." *Stutzman v. Krenik*, 350 F. Supp. 3d 366, 383 (D. Md. 2018) (quoting *Barbre v. Pope*, 402 Md. 157, 187 (Md. 2007) (internal quotation marks omitted)).

Here, Plaintiffs allege:

> By their conduct toward Mr. Green, enumerated *supra*, Defendants engaged in intentional, willful, and wanton misconduct with reckless disregard for the consequences to Mr. Green.
>
> \*      \*      \*
>
> Defendants' gross negligence proximately caused the injuries that Mr. Green sustained. All of Mr. Green's injuries were caused solely by the gross negligence of Defendants without any contributory negligence by Mr. Green.
>
> \*      \*      \*
>
> Defendants' conduct was without legal justification and was improperly motivated by a reckless disregard for the consequences to Mr. Green.

(ECF No. 1 ¶¶ 221-223.)

Plaintiffs maintain that the Doe and Officer Defendants were grossly negligent by physically restraining Green, placing him in the prone position, and strapping him down to the stretcher. Plaintiffs' allegation, however, that Defendants violated MIEMSS is insufficient to state a claim for gross negligence. *See Stracke v. Estate of Butler*, 465 Md. 407, 425-26 (2019) (holding that "failure to adhere to protocols and policies does not itself establish a reckless disregard for human life or amount to gross negligence" and "[t]he mere fact that Petitioners inaccurately diagnosed and treated their patient does not elevate their conduct to gross negligence"). Further, Plaintiffs' gross negligence counts are squarely at odds with Plaintiffs' allegations and

---

[11] *Graham v. Connor*, 490 U.S. 386 (1989).

incorporated documents elsewhere in the Complaint.  For example,  Plaintiffs do not allege that all Officer Defendants strapped Green to the stretcher; Plaintiffs allege the Doe Defendants took that action, that Defendant Officer Bodner helped place Green in the ambulance, and that "he 'handed one of the paramedics one of the straps for the stretcher and that they buckled it . . . .'" (ECF No. 1 ¶¶ 57-61; quoting an Officer Defendant reports for their truth.)

Viewed in the light most favorable to Plaintiffs, the Complaint does not allege facts to support the conclusion that the Officer and Doe Defendants "acted with wanton reckless disregard."  *See Barbre v. Pope*, 402 Md. 157, 187 (2007).  The Motion will be granted as to Counts XV and XVI against all Defendants.

### J.    Counts XVII and XVIII – Negligent Hiring, Training, Retention, and Supervision

Counts XVII and XVIII set forth negligent hiring, training, retention, and supervision claims against Defendant City.  (ECF No. 1.)

Defendants argue, and Plaintiffs concede, that Counts XVII and XVIII are precluded by the Local Government Torts Claim Act ("LGTCA").  (ECF No. 6-1 at 26.)  The court agrees.  *See Solis v. Prince George's Cnty.*, 153 F. Supp. 2d 793, 806 (D. Md. 2001) (concluding that while the "LGTCA represents a limited waiver of a municipality's governmental immunity," the LGTCA "does not authorize the maintenance of a suit directly against the local government").  The Motion will be granted as to Counts XVII and XVIII.[12]

---

[12] Plaintiffs request leave to amend to bring these counts "against the correct employee defendants of the City."  (ECF No. 14 at 37.)  Dismissal of claims resulting from the court's ruling on the Motion will be without prejudice.  The court will address any requests for leave to amend in accordance with the applicable court rules should Plaintiffs file for same by separate ECF following the court's order accompanying this memorandum opinion.

### K.    Count XIX - Wrongful Death

Count XIX sets forth a wrongful death claim against all Defendants.  Defendants argue that Count XIX should be dismissed because it is not a standalone cause of action.  (ECF No. 6-1 at 26-27.)  Defendants are incorrect.  "The wrongful death statute allows the decedent's beneficiaries or relatives to recover damages for loss of support or other benefits that would have been provided, had the decedent not died as a result of another's" wrongful act as defined by the statute.  *Spangler v. McQuitty*, 449 Md. 33, (2016).  The wrongful death claim is a separate cause of action.  *Gardner v. Greg's Marine Constr., Inc.*, No. DKC 13-1768, 2014 U.S. Dist. LEXIS 4692, at *29-30 (D. Md. Jan. 14, 2014).

"To plead a wrongful death claim under Maryland law, a plaintiff must allege: (1) the victim's death; (2) that the victim's death was proximately caused by the negligence [or other 'wrongful act'] of the defendant; (3) that the victim's death resulted in injury to the plaintiff, who falls within the category of beneficiaries defined by the statute; and (4) that the claim is brought within the applicable statutory period."  *Willey v. Bd. of Educ.*, 557 F. Supp. 3d 645, 670 (D. Md. 2021).  Maryland's Wrongful Death Act defines "wrongful act" as "an act, neglect, or default including a felonious act which would have entitled the party injured to maintain an action and recover damages if death had not ensued."  MD. CODE ANN., CTS. & JUD. PROC § 3-902.

Plaintiffs allege:

> Plaintiffs Brittany Green, Tiffany Green, Jayda Green, Phyllis McGowan, and Tracy Naylor are primary beneficiaries in this action pursuant to Md. Code Ann., Cts. & Jud. Proc. § 3-904. They have brought this action within the appropriate time limits set forth in the Maryland Wrongful Death Act.
>
> *           *           *
>
> Defendants, as a direct and proximate result of their acts and/or omissions enumerated *supra* (including but not limited to those pled

in in paragraphs 1 through 86), wrongfully killed Mr. Green when
they strapped him to the stretcher in a face-down position against
the MIEMSS Protocols, established medical and law enforcement
practice, and Mr. Green's clearly established constitutional rights on
June 1, 2021.

\*      \*      \*

Mr. Green had done nothing to warrant the use of deadly force, and
there was no legal justification for Defendants to use such force.
Defendants acted with negligence, gross negligence, recklessness,
and deliberate indifference to Mr. Green's rights.

\*      \*      \*

Each and every Defendant, individually or through their agents,
servants, or employees, was directly and proximately responsible for
the homicide of Mr. Green. His death was caused by the actions of
the Defendants without any wrongdoing by Mr. Green.

(ECF No. 1 ¶¶ 250-253.)

Because the court finds that Plaintiffs fail to state a claim for any "wrongful act," Plaintiffs

fail to state a wrongful death claim.  The Motion will be granted as to Count XIX.

### L.    Count XX – Survival Action

Count XX sets forth a survival action against all Defendants.  Defendants argue that Count

XX should be dismissed because it "merely restate[s] claims already alleged in previous counts"

and is not a standalone cause of action, but rather the "mechanism" through which an estate may

bring a claim its decedent could have asserted were he alive.  (ECF No. 6-1 at 26-27.)  Defendants

are correct.

"In a survival action, the personal representative of the victim may sue to recover, for the

estate of the victim, damages for the economic and non-economic losses suffered by the victim

prior to his or her death—the damages that the victim would have been able to recover had he or

she survived." *Willey v. Bd. of Educ.*, 557 F. Supp. 3d 645, 670 (D. Md. 2021).  In contrast to a

wrongful death action, the survival statute creates no independent cause of action. *Johnson v. Balt. Police Dep't*, No. SAG-2375, 2021 U.S. Dist. LEXIS 78936, at *16 (D. Md. Apr. 23, 2021); *Mang v. City of Greenbelt*, No. DKC-11-1891, 2012 U.S. Dist. LEXIS 4345, at *22 (D. Md. Jan. 13, 2012) (explaining that "a survival action is merely the mechanism by which an estate brings a claim that the decedent could have asserted had he survived" and not an independent cause of action); *Gardner v. Greg's Marine Constr., Inc.*, No. DKC-13-1768, 2014 U.S. Dist. LEXIS 4692, at *29 (D. Md. Jan. 14, 2014) (dismissing a survival action count because "there is no separate cause of action known as a 'survival claim'"); MD. CODE ANN., EST. & TRUSTS § 7-401(y) ("[A personal representative] may prosecute, defend, or submit to arbitration actions, claims, or proceedings . . . for the protection or benefit of the estate, including the commencement of a personal action which the decedent might have commenced or prosecuted . . .").

Accordingly, Count XX will be dismissed as against all Defendants.

### M.    Motion for More Definite Statement

The Complaint sets forth more than adequate information and detailed allegations to enable Defendants to frame an answer if the Complaint prevailed over the Motion to Dismiss; however, in view of the foregoing, the Motion for More Definite Statement (included at ECF No. 6) will be denied as moot.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, by accompanying order, Defendants' Motion to Dismiss Plaintiffs' Complaint will be granted; Defendants' Motion for More Definite Statement will be denied as moot; and Plaintiffs' Motion for Leave to Conduct Early Discovery will be denied.

/S/

_____
Julie Rebecca Rubin
United States District Judge

Case No. 1:22-cv-03198-JRR
September 30, 2023